# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARGARITA GARCIA-RAMIREZ,
                                    *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,*
                                    *Respondent.*

No. 02-73543

Agency No.
A75-268-464

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 9, 2004—Seattle, Washington

Filed August 26, 2005

Before: Dorothy W. Nelson, Raymond C. Fisher and
Ronald M. Gould, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Fisher;
Concurrence by Judge Gould

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as
Attorney General of the United States, pursuant to Fed. R. App. P.
43(c)(2).

---

**COUNSEL**

Manuel F. Rios, Rios Cantor, P.S., Seattle, Washington, for the petitioner.

Anthony P. Nicastro, Office of Immigration Counsel, Washington, D.C., for the respondent.

---

**OPINION**

PER CURIAM:

Petitioner Margarita Garcia-Ramirez, a native and citizen of Mexico, petitions for review of a decision of the Board of Immigration Appeals ("BIA"), affirming without opinion an Immigration Judge ("IJ") decision denying her application for cancellation of removal because of her failure to establish 10 years of continuous physical presence in the United States. Garcia-Ramirez asserts that the BIA and IJ impermissibly applied the continuous presence requirement of 8 U.S.C. § 1229b(d)(2) (the "90/180-day rule")[1] retroactively to find

---

[1]The 90/180-day rule provides that "[a]n alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) of this section if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days." 8 U.S.C. § 1229b(d)(2). All statutory citations hereinafter are to 8 U.S.C. unless otherwise indicated.

her automatically ineligible for cancellation of removal because she departed the United States for five months between April and September 1989. Our prior decisions governing similar claims under the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 309(c), compel us to reject her claim.

## I.

Garcia-Ramirez entered the United States illegally in May 1988 and has, but for one absence, lived in the country continuously since then. In April 1989, Garcia-Ramirez left the United States to visit family in Mexico. She returned to the United States in September 1989. It is the effect of this five-month absence on her accrual of time of continuous presence in the United States that is the crux of this appeal.

On April 10, 1997, the Immigration and Naturalization Service ("INS")[2] initiated removal proceedings against Garcia-Ramirez as an alien present in the United States without being admitted or paroled. The parties agree that Garcia-Ramirez's accrual of physical presence time ended on October 7, 1998, when she was served with a notice to appear before an IJ.[3] On March 1, 1999, Garcia-Ramirez appeared in immigration court, admitted to the allegations in the notice to appear and requested that the IJ grant her cancellation of removal relief

---

[2]On March 1, 2003, the INS was abolished as an agency within the Department of Justice and its functions were transferred to the newly created Department of Homeland Security.

[3]Under IIRIRA, an alien's accrual of physical presence time ends when removal proceedings are commenced against the alien through service of a notice to appear before an IJ. § 1229b(d)(1). The INS initially served Garcia-Ramirez with a notice to appear on April 10, 1997. However, this notice failed to specify the date or location of Garcia-Ramirez's immigration hearing. Garcia-Ramirez was not served with a proper hearing notice until October 7, 1998. Under § 1229(a), service of this second notice to appear ended Garcia-Ramirez's accrual of physical presence.

under § 1229b(b)(1) or, in the alternative, voluntary departure.

The IJ found Garcia-Ramirez removable as charged and denied her request for cancellation of removal. In order to be eligible for cancellation of removal, Garcia-Ramirez had to demonstrate continuous physical presence in the United States of not less than 10 years. § 1229b(b)(1)(A). Applying the 90/180-day rule of § 1229b(d)(2), the IJ found that Garcia-Ramirez's five-month absence in 1989 had interrupted her otherwise continuous presence between May 1988 and the service of her notice to appear in October 1998. Because Garcia-Ramirez's trip lasted more than 90 days, and less than 10 years had elapsed between her reentry in September 1989 and service of the notice to appear, the IJ determined that Garcia-Ramirez was ineligible for cancellation of removal. The IJ granted Garcia-Ramirez's alternative request for voluntary departure.

Garcia-Ramirez appealed to the BIA, which affirmed the IJ's decision without an opinion. Garcia-Ramirez thereafter filed her petition for review with our court. We have jurisdiction under § 1252(a) and deny the petition for review.

## II.

Garcia-Ramirez asserts that the 90/180-day rule in § 1229b(d)(2) cannot be applied to her because that provision did not become law until 1997, and she left and reentered the United States in 1989. She maintains that because she would have remained eligible for cancellation of removal under the law in effect at the time of her departure and reentry, § 1229b(d)(2) retroactively eliminates her preexisting right to relief from removal and thereby offends due process. We first address the government's argument that we do not have jurisdiction to review the petition and then turn to the merits of Garcia-Ramirez's claim.

### A. Jurisdiction

**[1]** The government challenges our jurisdiction to review Garcia-Ramirez's petition, asserting that she failed to exhaust administrative remedies because she did not present her retroactivity claim to the BIA. Under § 1252(d)(1) we "may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right." *Bagues-Valles v. INS*, 779 F.2d 483, 484 (9th Cir. 1985); *see also id.* ("As a general rule, issues not raised before an administrative tribunal cannot be raised on appeal from that tribunal."). Because the BIA does not have jurisdiction to resolve constitutional challenges, however, due process claims — other than those alleging only "procedural errors" within the BIA's power to redress — are exempt from this administrative exhaustion requirement. *Vargas v. INS*, 831 F.2d 906, 908 (9th Cir. 1987).

**[2]** Garcia-Ramirez's claim is properly viewed as an assertion that application of the 90/180-day rule of § 1229b(d)(2) to her violates due process because of impermissible retroactivity. *See INS v. St. Cyr*, 533 U.S. 289, 316 (2001) (recognizing that Congress has the power to enact retroactive legislation, but confirming that there are constitutional limits on retroactivity). Retroactivity challenges to immigration laws implicate legitimate due process considerations that need not be exhausted in administrative proceedings because the BIA cannot give relief on such claims. *See Bagues-Valles*, 779 F.2d at 484. Accordingly, we have jurisdiction to review Garcia-Ramirez's retroactivity claim even though it was not raised before the BIA.

### B. Retroactivity

**[3]** We turn to the merits of Garcia-Ramirez's claim that the IJ should not have applied the 90/180-day rule of § 1229b(d)(2) to find that her five-month absence in 1989 terminated continuous physical presence. Section 1229b(d)(2)

provides a bright-line rule that an alien "shall be considered to have failed to maintain continuous physical presence in the United States" if the alien "has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days." Garcia-Ramirez does not contest that if § 1229b(d)(2) applies retroactively, her five-month absence in 1989 would violate the 90/180-day rule.

**[4]** From 1986 until IIRIRA's effective date in April 1997, however, the relevant statute provided that a departure from the United States did not break continuous presence if it was "brief, casual, and innocent and did not meaningfully interrupt the [alien's] continuous physical presence" in the United States. § 1254(b)(2) (1995). "The evident statutory purpose [of this standard was] to recognize that a person who lives for [the requisite number of years] in the United States does not destroy [her] eligibility by actions that do not affect [her] commitment to living in this country." *Castrejon-Garcia v. INS*, 60 F.3d 1359, 1362 (9th Cir. 1995). Under this pre-IIRIRA rule, "[f]or purposes of evaluating whether an absence is brief, single absences in excess of 90 days . . . will be evaluated on a case-by-case basis." 8 C.F.R. § 240.64(b)(1); 8 C.F.R. § 1240.64(b)(1). Garcia-Ramirez contends that the more flexible § 1254 standard must be used to evaluate her continuous presence because applying § 1229b(d)(2) would be impermissibly retroactive.

### 1.

**[5]** In its landmark decision in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the Supreme Court set forth the principles we must consider in determining whether a statute should be applied retroactively. Noting that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic," the Court stated in plain terms that,

> [e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal."

*Id.* at 265 (quoting *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)); *see INS v. St. Cyr*, 533 U.S. at 316.

**[6]** In light of these principles, the Court articulated a two-step approach for evaluating when the normal presumption against retroactivity should not apply. Our "first task" under *Landgraf* is to "determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If Congress has clearly expressed that a law should be applied to conduct occurring before its enactment, our inquiry ends and we must defer to Congress' command. Otherwise, we proceed to *Landgraf's* second step and ask "whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If the new law would have such a retroactive effect, the "traditional presumption teaches that [the new statute] does not govern . . . ." *Id.*

## 2.

The first step of *Landgraf* requires us to "ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316. The Supreme Court has cautioned that "[t]he standard for finding such unambiguous direction is a demanding one." *Id.* "[C]ases where [the Supreme] Court has found truly 'retroactive' effect

adequately authorized by a statute have involved statutory language that was so clear that it could sustain only one interpretation." *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997). Garcia-Ramirez argues that under this exacting standard, congressional intent to apply the 90/180-day rule retroactively cannot be found because § 1229b(d)(2) contains no statement as to its intended temporal reach.

**[7]** Prior circuit law compels us to reject her argument. We have held, in a series of related cases, that IIRIRA's "transitional rules," which govern application of IIRIRA's permanent provisions to cases that were pending on IIRIRA's effective date, contain unambiguous congressional intent that the Act's stop-time[4] and 90/180-day rules apply retroactively. Although the transitional rules do not directly govern Garcia-Ramirez's case, it would be incongruous to hold that Congress intended to apply the 90/180-day rule to petitioners governed by those rules, but not to Garcia-Ramirez.

**[8]** When Congress enacted IIRIRA, it included in the statute a set of "transitional rules" specifying that particular provisions of the permanent statute should apply to petitioners against whom the INS had already initiated proceedings before the statute's effective date. *See* IIRIRA § 309(c). These transitional rules expressly provide that two of IIRIRA's provisions relating to continuous presence — the stop-time rule and the 90/180-day rule — "shall apply to orders to show cause . . . issued *before, on, or after* the date of the enactment of this Act." IIRIRA § 309(c)(5)(A) (emphasis added).

---

[4]The "stop-time" rule provides that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2) of this section, when the alien is served a notice to appear under § 1229(a) of this title, or (B) when the alien has committed [certain criminal offenses], whichever is earliest." § 1229b(d)(1).

We first addressed this "before, on, or after" language in *Ram v. INS*, 243 F.3d 510 (9th Cir. 2001). Ram argued that the stop-time rule — which specifies that an alien's period of continuous physical presence ends when deportation proceedings begin — could not be applied to his petition because the INS had initiated proceedings against him before IIRIRA took effect and application of the rule to him would have an impermissible retroactive effect. We disagreed. We found unambiguous the statute's instruction that the stop-time rule be applied to petitioners who fall under the transitional rules whose orders to show cause were "issued *before, on, or after* the date of enactment [of IIRIRA]," and also relied on IIRIRA's legislative history, which suggested that Congress intended the transitional rules to apply the stop-time rule retroactively. *See Ram*, 243 F.3d at 515-18 (quoting IIRIRA § 309(c)(5)(A)).

We later followed *Ram* in *Mendiola-Sanchez v. Ashcroft*, 381 F.3d 937 (9th Cir. 2004), to hold that § 309(c)(5)(A) requires retroactive application of the 90/180-day rule as well. The Mendiolas, whose case was governed by the transitional rules, argued that a five-month trip they took in 1993 should not bar their eligibility for suspension of deportation because the pre-IIRIRA "brief, casual, and innocent" standard rather than IIRIRA's 90/180-day rule should apply to their petition. We rejected their claim, reasoning that "it is very unlikely that Congress intended to apply only the stop-time rule retroactively, and not the 90/180-day rule. IIRIRA § 309(c)(5)(a) states that both provisions apply to aliens whose deportation proceedings were pending on the date of IIRIRA's enactment and there is no indication that the two provisions should be applied differently." *Id.* at 941.

**[9]** These cases compel us to reach the same conclusion here. Garcia-Ramirez correctly argues that § 1229b(d)(2) does not reflect an express congressional intent that it should be applied retroactively, and we agree with her that use of the past present tense — "an alien shall be considered to have failed to maintain continuous presence" if the alien "has

departed" from the United States for more than 90 days — is an insufficient ground from which to infer such intent under the *Landgraf* standard. *Mendiola-Sanchez*, however, holds that the broader IIRIRA statute, specifically § 309(c)(5)(a) of the transitional rules, does contain unambiguous congressional intent that the 90/180-day rule be applied retroactively. Although the INS did not initiate proceedings against Garcia-Ramirez until after IIRIRA's effective date, and thus the transitional rules do not govern her petition, § 309(c)(5)(a) is part of the IIRIRA statute and stands as persuasive evidence, as construed by *Mendiola-Sanchez*, that Congress intended to apply the 90/180-day rule to non-citizens who, like the Mendiolas and Garcia-Ramirez, left the country for periods of more than 90 days before IIRIRA's passage.

Declining to apply the 90/180-day rule here would therefore produce an incongruous result. Garcia-Ramirez's circumstances closely resemble those of the Mendiolas, whose claims were arguably even more compelling than those of Garcia-Ramirez. She entered the country illegally in May 1988 and has lived in the country continuously since that date with the exception of her five-month trip in 1989 to visit family in Mexico. The Mendiolas, however, had continuously resided in the United States for even longer, since 1983. After accumulating 10 years of continuous presence in the United States, Mendiola took a six-month trip to Mexico in 1993 to care for his parents and was joined by his son for five months of that trip. Although Mendiola's wife and daughter, who had not traveled to Mexico, received relief from deportation, we upheld the BIA's application of the 90/180-day rule to Mr. Mendiola and his son.

The legal distinction between these two cases derives solely from the fortuity that the INS initiated proceedings against the Mendiolas one day *before* IIRIRA's effective date but did not place Garcia-Ramirez in removal proceedings until after the statute became effective. The transitional rules thus controlled the Mendiolas' case, whereas the permanent provisions apply

to Garcia-Ramirez. Neither Garcia-Ramirez nor the Mendiolas could have known when they took their trips to Mexico that the "brief, casual, and innocent" standard would be abrogated and replaced with IIRIRA's 90-day bright line rule, and the Mendiolas, who received their orders to show cause before IIRIRA's effective date, seemingly have the more compelling argument that IIRIRA's new provisions should not apply to them.

**[10]** Because we have already held that IIRIRA's transitional rules contain express congressional intent to apply the 90/180-day rule to petitioners who left the country for more than 90 days before IIRIRA's passage, we conclude that we are required to apply the rule to all such petitioners, whether their cases are governed by the transitional rules or IIRIRA's permanent provisions.

**Petition DENIED.**

---

FISHER, Circuit Judge, with whom D. W. NELSON, Senior Circuit Judge, joins, concurring:

Although we hold that *Mendiola-Sanchez v. Ashcroft*, 381 F.3d 937 (9th Cir. 2004), compels us to affirm application of the 90/180-day rule to Garcia-Ramirez, we do so reluctantly because we remain unconvinced that *Ram v. INS*, 243 F.3d 510 (9th Cir. 2001), required the result reached in *Mendiola-Sanchez*, and because we believe that Garcia-Ramirez would have prevailed under the second step of the retroactivity test articulated in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

The *Mendiola-Sanchez* panel articulated its own regret in holding that the 90/180-day rule must apply retroactively to the Mendiolas:

> Although we deny the petition for review because that is the proper conclusion under the relevant statutes, we pause in recognition of the injustice of this result. . . . The only reason the Mendiolas are ineligible for suspension of deportation is that they stayed too long in Mexico to help Mr. Mendiola-Sanchez's elderly parents recover from unexpected injuries.

*Mendiola-Sanchez*, 381 F.3d at 941. Nonetheless, the panel concluded that the "core of the reasoning in *Ram* applie[d] to the 90/180 day rule" and that it was "very unlikely that Congress intended to apply only the stop-time rule retroactively, and not the 90/180 day rule." *Id.* at 940-41. Accordingly, the panel held that *Ram* controlled and denied the Mendiolas' petition for relief.

We do not think that *Ram* required the result in *Mendiola-Sanchez*. Section 309(c)(5)(A) of IIRIRA (included in the statute's "transitional rules") instructs that the stop-time and 90/180-day rules should be applied to petitioners whose cases were pending on IIRIRA's effective date whether their orders to show cause were issued "on, before, or after" IIRIRA's enactment. With regard to the stop-time rule, this provision constitutes unambiguous congressional intent that the statute be applied retroactively: regardless of when an alien's order to show cause was issued, her accrued continuous presence time must, under § 309(c)(5)(A), stop on that date. Application of § 309(c)(5)(A) to the 90/180-day rule, however, is slightly more complicated because it changes the rules as to actions the petitioner has already taken.

Under *Ram*, § 309(c)(5)(A) requires that the 90/180-day rule apply to petitioners whose cases were pending when IIRIRA became effective, but *Ram* has no effect on a subsequent question — whether even if the 90/180-day rule applies to a petitioner's case, it applies to trips that she took before Congress passed IIRIRA. The *Mendiola-Sanchez* panel did not consider this second question, not present in *Ram*, before

reaching its conclusion that *Ram* controlled. On a blank slate, we would construe § 309(c)(5)(A) as expressing congressional intent to apply the 90/180-day rule to all petitioners whose cases were pending when IIRIRA became effective on April 1, 1997, but only to their absences from the country that post-date IIRIRA's enactment on September 30, 1996. Admittedly, the rule would then affect only a very small class of petitioners. But applying the *Landgraf* standard, we would not read the statute to attach penalties to trips taken before Congress passed IIRIRA, absent express, unambiguous congressional intent to do so.

Further, if *Mendiola-Sanchez* erred in finding congressional intent in § 309(c)(5)(A) — which we respectfully think it did but which we accept as binding on us — we believe that Garcia-Ramirez would be entitled to a remand for reconsideration of her petition under the old standard. Where Congress has not clearly specified otherwise, the traditional presumption against retroactivity applies if the statute would have retroactive effect.

> A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, *or attaches a new disability, in respect to transactions or considerations already past.*

*INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (quoting *Landgraf*, 511 U.S. at 269) (internal quotation marks omitted) (emphasis added). Retroactivity analysis involves a "commonsense, functional judgment about whether the new provision *attaches new legal consequences to events completed before its enactment*," and is "informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (quoting *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999)) (internal quotation marks omitted) (emphasis added).

On its face, the application of § 1229b(d)(2) to Garcia-Ramirez long after the fact of her 1989 five-month trip to Mexico clearly "attach[es] a new disability, in respect to [a transaction] already past." *Id.* At the time she took her trip, Garcia-Ramirez risked that her absence would later be judged not to have been "brief, casual, and innocent," thereby effectively restarting the clock when she returned in 1990. She did not have an assurance, therefore, that her departure and return would have no adverse effect; but she likewise did not have reason to believe that her five-month absence would *automatically* negate her accrued time and restart the clock — which is the effect of applying the new bright-line rule of the 1997 statute. "There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *Id.* at 325. Because applying § 1229b(d)(2) to Garcia-Ramirez "attaches new legal consequences to events completed before its enactment," doing so has an impermissibly retroactive effect. *Id.* at 321 (quoting *Martin*, 527 U.S. at 357-58 (quoting *Landgraf*, 511 U.S. at 270)).

Elementary notions of fairness and fair notice, reasonable reliance, settled expectations and commonsense also counsel in favor of applying the traditional presumption of nonretroactivity. When Garcia-Ramirez took her trip, she had no reason to believe that her absence would automatically disqualify her from eligibility for relief; she could reasonably rely on the law at the time as governing the effects of her departure. The change in law should not, absent clearly expressed Congressional intent, bar her eligibility retroactively. When a statute converts a five-month trip from a risk of losing eligibility for relief from removal to an automatic certainty, what greater need is there for notice and a chance to conform one's behavior to the new, bright-line rule? This is a paradigm instance of the law imposing a new legal disability based on an event completed before the law changed. Nonetheless, because Judge Gould does not agree with us, we will address the specific arguments for and against retroactivity.

Section 1229b(d)(2) should be impermissibly retroactive as applied to Garcia-Ramirez because the 90/180-day rule automatically makes her ineligible for cancellation of removal, whereas she would not be automatically ineligible for such relief under the pre-IIRIRA "brief, casual, and innocent" standard. She did not seek an assurance that her absence was in fact "brief, casual, and innocent"; instead, she sought eligibility to argue this point to the BIA on remand. Analogously, in *St. Cyr,* the Supreme Court held that IIRIRA's elimination of discretionary relief for aliens convicted of aggravated felonies could not be applied retroactively to an alien who had pled guilty before IIRIRA's effective date. *See id.* at 326.

Although Garcia-Ramirez cannot point to the kind of quid pro quo that the Supreme Court presumed to have occurred in *St. Cyr* — a guilty plea — the Court has by no means set forth quid pro quo as the only route for demonstrating that a statute is impermissibly retroactive. Rather, "[n]o single consideration is essential. Retroactivity analysis under *Landgraf* requires independent analysis of whatever factors may apply, any of which can ground a finding of impermissible retroactive application." *Chang v. United States*, 327 F.3d 911, 920 n.8 (9th Cir. 2003); *see also Hughes Aircraft Co. v. United States*, 520 U.S. 939, 947 (1997) (emphasizing that "the Court has used various formulations to describe the functional conceptio[n] of legislative retroactivity") (internal quotation marks omitted); *Restrepo v. McElroy*, 369 F.3d 627, 637 (2d Cir. 2004) ("[T]he Court never suggested that all parties who claim that a statute has a retroactive effect must show the disruption of a *quid pro quo* exchange. And it would be out of keeping with the reasoning of *St. Cyr* [ ] to read such a *quid pro quo* requirement into that opinion. For in *St. Cyr* [ ], the Court observed that 'categorical arguments are not particularly helpful in undertaking *Landgraf*'s commonsense, functional retroactivity analysis.' ") (quoting *St. Cyr*, 533 U.S. at 324).

Nor does our circuit law impose an additional requirement that in order to establish reliance on the old law, a petitioner must in all circumstances demonstrate actual, subjective reliance or a quid pro quo exchange to establish impermissible retroactivity. "Reasonable reliance may itself be based upon a quid pro quo, as in *St. Cyr* . . . or merely on assurances as to the current status of the law." *Chang*, 327 F.3d at 920 n.8 (citation omitted) (holding that new INS rules could not be applied to investors whose petitions were approved before the rules were promulgated, because they would impose a new exhaustion requirement and take away the right of appeal without fair notice); *see also Kankamalage v. INS*, 335 F.3d 858, 863 (9th Cir. 2003) (applying *St. Cyr* and concluding that a regulation impermissibly attached a new disability to an alien's guilty plea, without examining whether the alien specifically bargained for eligibility at the time of the plea); *United States v. Velasco-Medina*, 305 F.3d 839, 849-50 (9th Cir. 2002) (holding that Velasco-Medina could not have reasonably relied on the possibility of relief under the legal landscape at the time he entered his guilty plea).[1]

Thus we disagree with Judge Gould that applying *St. Cyr* to Garcia-Ramirez's situation would constitute an extension

---

[1]Judge Gould challenges our reliance on *Kankamalage* and *Velasco-Medina*, stating that "these cases do not assist in de-emphasizing the importance the Supreme Court in *St. Cyr* placed on reasonable reliance, settled expectations and vested interests." Judge Gould concurrence at 11675. We agree that these cases require reasonable reliance, but objectively reasonable reliance. As both cases involve guilty pleas, they follow *St. Cyr* in holding that a guilty plea is evidence of reasonable reliance and do not speak to the question of what other circumstances might evidence reliance. In discussing the defendants' reliance and expectations, both cases turn on the state of the *law* at the time that the plea was entered, not on the defendant's subjective expectations at that time. Thus, we held that, unlike St. Cyr and Kankamalage, Velasco-Medina did not have settled expectations of § 212(c) relief because AEDPA put him on notice that such relief might not be available and his expectations "must have been shaped by the then-current legal landscape." *Velasco-Medina*, 305 F.3d at 849.

either of *St. Cyr* or of retroactivity analysis more generally. Indeed, both the Third and the Fourth Circuits have recently rejected the contention that retroactivity analysis requires actual reliance or the type of quid pro quo exchange present in *St. Cyr. See Ponnapula v. Ashcroft*, 373 F.3d 480, 491-93 & n.9 (3d Cir. 2004) (holding that Supreme Court law requires "reasonable" not "actual" reliance, observing that "*St. Cyr* was an easy case on the retroactivity issue," and noting that the presence of a quid pro quo is *evidence* of a reliance interest); *Olatunji v. Ashcroft*, 387 F.3d 383 (4th Cir. 2004) (holding that consideration of reliance is irrelevant to statutory retroactivity analysis; alternatively, that only objectively reasonable reliance, not subjective reliance, is required).

There are several hallmarks of retroactivity present here that demonstrate that application of the 90/180-day rule to Garcia-Ramirez upsets settled expectations without notice. First, "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." *St. Cyr*, 533 U.S. at 325. By pleading guilty to the charged offense, St. Cyr risked eventual deportation and denial of § 212(c) relief. The Supreme Court explained that turning the possibility of deportation into a certainty would have "a severe retroactive" effect. *Id.* Similarly, by leaving the country for five months, Garcia-Ramirez risked eventual deportation based on a later determination that her absence was not "brief, casual, and innocent." Applying IIRIRA now to her past conduct, however, makes her potential ineligibility for suspension of deportation absolute. Of course, Garcia-Ramirez had little accrued time when she took her trip to Mexico in 1989. But however brief, that accrued time has turned out to be vital to her ability to satisfy the continuous physical presence requirements.

Second, there is a significant difference between a statute that extends the time required to qualify for possible relief from removal — extending the duration from seven to 10

years — and one that reaches back to prior conduct and automatically subtracts it from one's accrued continuous presence. Thus, applying the presumption against retroactivity here would in no way conflict with our holding in *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir. 2002), that IIRIRA's new 10-year rule can be applied to petitioners who were present in the United States before its enactment. Jimenez-Angeles did not forfeit any part of her accumulated time — or suffer any consequences she could have avoided by changing her prior actions once her continuous presence clock began running had she known the requisite time would be extended to 10 years. A person in Garcia-Ramirez's situation, on the other hand, could, with notice, simply have remained within the bounds of the 90/180-day parameters of the new law.

Third, considerations of reasonable reliance and fair notice counsel against the application of § 1229b(d)(2) to Garcia-Ramirez. Garcia-Ramirez's "settled expectations must have been shaped by the then-current legal landscape." *Velasco-Medina*, 305 F.3d at 849; *see also Kankamalage*, 335 F.3d at 863. When the "relevant past event" occurred, namely Garcia-Ramirez's decision to leave the United States in 1989 for more than 90 days, she could reasonably have relied on existing law to conclude that her departure would not necessarily restart the clock on a bid to establish continuous physical presence in the United States. *Landgraf*, 511 U.S. at 270. By contrast, Jimenez-Angeles had no basis in law for believing that her relevant past event — turning herself in before IIRIRA's effective date — would cause the INS to place her into deportation proceedings before IIRIRA's effective date or under pre-IIRIRA law. *See Jimenez-Angeles*, 291 F.3d at 602; *see also Lopez-Urenda v. Ashcroft*, 345 F.3d 788, 793 (9th Cir. 2003); *Vasquez-Zavala v. Ashcroft*, 324 F.3d 1105, 1107 08 (9th Cir. 2003).[2] Far from relying on the mere hope

---

[2]We have subsequently relied on this aspect of *Jimenez-Angeles* in concluding that two aliens who filed asylum applications on March 10, 1997

of beneficence by the INS, in 1989 aliens such as Garcia-Ramirez had statutory assurance about how their temporary departures would be evaluated. *See* 8 U.S.C. § 1254(b)(2) (1995); *Chang*, 327 F.3d at 920 n.8.

As in *St. Cyr*, *Chang* and *Kankamalage*, a finding of impermissible retroactivity here would not depend on Garcia-Ramirez showing that she actually, subjectively relied on 8 U.S.C. § 1254(b)(2) when she departed the United States. *See St. Cyr,* 533 U.S. at 322-25 (presuming a quid pro quo without proof of actual reliance); *see also Olatunji*, 387 F.3d at 393 ("*St. Cyr* did not purport to add a subjective reliance requirement; rather it applied *Landgraf* to a set of facts that indicated 'an *obvious and severe* retroactive effect.' " (citing *St. Cyr*, 533 U.S. at 325) (emphasis added)); *Ponnapula*, 373 F.3d at 491 ("The Supreme Court has never required actual reliance or evidence thereof in the *Landgraf* line of cases, and has in fact assiduously eschewed an actual reliance requirement."). Rather, given the statutory structure in 1989 — in which temporary absences were assessed under a judgmental, discretionary standard — we would not presume that Garcia-Ramirez's decision to remain in Mexico for more than 90 days would have been the same had § 1229b(d)(2)'s 90/180-day absolute limitation been on the books instead.

---

— shortly before IIRIRA went into effect on April 1, 1997 — had no settled expectations that they would be subject to deportation proceedings under pre-IIRIRA law rather than removal proceedings under IIRIRA. *See Vasquez-Zalava*, 324 F.3d at 1108. IIRIRA was not impermissibly retroactive as applied to these asylum applicants because, as was the case when Jimenez-Angeles turned herself in, "any expectation that an INS action would thereafter commence could not support a sufficient expectation as to *when* it would commence." *Id.* (emphasis in original); *see also Lopez-Urenda*, 345 F.3d at 794 (extending *Vasquez-Zalava*'s holding to aliens who filed asylum applications before IIRIRA's passage on September 30, 1996, because even assuming their asylum applications would be denied, the applicants "did not have settled expectations as to *when* proceedings against them would commence") (emphasis in original).

We would not dispense with the requirement of reasonable reliance. We simply find it to be objectively reasonable that an alien like Garcia-Ramirez, contemplating a trip outside the United States in 1989, could reasonably rely on the then-applicable legal standard not later being converted to one that automatically restarted the clock on her continuous presence because she exceeded the 90-day limit — a limit she could have stayed within had that been the rule at the time. Therefore, applying § 1229b(d)(2) to her 1989 departure impermissibly attaches new legal consequences that did not exist before IIRIRA. *See Landgraf*, 511 U.S. at 270.

We agree with Judge Gould that Congress retains its superordinate role in formulating and reformulating our immigration laws. *See* Judge Gould concurrence at 11679. But it is settled law that in doing so, Congress must express its intent *clearly*. *See, e.g.*, *St. Cyr*, 533 U.S. at 316.[3] Congress has not done so with respect to applying the new 90/180-day rule to trips taken before IIRIRA's passage, and Garcia-Ramirez has demonstrated objectively reasonable reliance on the prior law. But for *Mendiola-Sanchez*, we would apply the "deeply rooted" presumption against retroactivity in favor of Garcia-Ramirez (and the Mendiolas). *See Landgraf*, 511 U.S. at 265.

---

[3]Judge Gould points to the REAL ID Act as an example of Congress implementing immigration law reform. *See* Judge Gould concurrence at 11680 n.7. The REAL ID Act illustrates our very point, because it contains express provisions instructing that certain changes in the law should be applied retrospectively and others only prospectively. *See* REAL ID Act, Pub. L. 109-13, 119 Stat. 231. Where such express instruction exists, we can be confident that Congress has weighed the costs and benefits of retroactive application of the new laws and has considered the potential hardships imposed on individuals who took actions under the old law. Absent such evidence that Congress has weighed and considered the effects of its new legislation on prior actions, we would not upset the settled expectations of petitioners like Garcia-Ramirez who took trips under the old legal landscape.

GOULD, Circuit Judge, concurring:

Judge Fisher, in his separate concurrence, states that he "reluctantly" agrees that our precedent governing similar claims under the transitional rules of IIRIRA requires that Garcia-Ramirez's petition be denied. *See Mendiola-Sanchez v. Ashcroft*, 381 F.3d 937 (9th Cir. 2004) and *Ram v. INS*, 243 F.3d 510 (9th Cir. 2001). My able colleague writes separately to explain his further view that, were he reviewing Garcia-Ramirez's petition "on a blank slate," he would proceed to the second step of the *Landgraf* retroactivity analysis[1] and conclude that the petition should be granted. I write separately, in turn, with my responsive views, as I conclude differently that, if we were called upon to apply *Landgraf*'s second step, the application of the 90/180-day rule to Garcia-Ramirez would not result in an impermissibly retroactive effect under the Supreme Court's precedent.

## I

A new statute does not produce an impermissibly retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269 (internal citation omitted). Rather, the question of whether constitutionally impermissible consequences result from a statute's

---

[1]In *St. Cyr*, the Supreme Court affirmed and reiterated the two-part framework for addressing potentially retroactive statutes that was established in *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). Applying the *Landgraf* test, a court must first ask "whether Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316; *see also Landgraf*, 511 U.S. at 280 (holding that Congress must "expressly prescribe[ ] the statute's proper reach"). If the statutory language does not meet this standard, our analysis must proceed to *Landgraf*'s second prong, asking whether the application of the statute "produces an impermissible retroactive effect." *St. Cyr*, 533 U.S. at 320. In our per curiam opinion, we conclude our *Landgraf* analysis at step one, holding that our prior circuit law compels the conclusion that Congress intended IIRIRA's 90/180-day rule to apply retroactively.

retrospective application is a "commonsense, functional judgment . . . guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.' " *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (quoting *Landgraf*, 511 U.S. at 270). "A statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted). However, the "application of new statutes passed after the events in suit is unquestionably proper in many situations." *Landgraf*, 511 U.S. at 273. *St. Cyr* is the Supreme Court's most recent pronouncement on *Landgraf*'s retroactivity analysis in the immigration context, and we must look to it to guide our own review. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (instructing lower courts to apply the Court's most direct precedent—clearly *St. Cyr* in this case—when looking for guidance and controlling authority). I begin by reviewing *St. Cyr* in some detail.

## A

Enrico St. Cyr was a lawful permanent resident alien who pled guilty to an aggravated felony charge. *St. Cyr*, 533 U.S. at 293. At the time of his guilty plea, St. Cyr's conviction rendered him deportable; however, he was then still eligible for a discretionary waiver of deportation that was available for permanent resident aliens pursuant to INA § 212(c). *Id.* IIRIRA repealed the Attorney General's discretion to waive deportation under § 212(c), replacing it in relevant part with 8 U.S.C. § 1229b(a)(3), which excluded anyone convicted of an aggravated felony from the relief of cancellation of removal. *Id.* at 297. Because his removal proceedings were not commenced until after IIRIRA's effective date, St. Cyr could no longer avail himself on the possibility of discretionary relief. The Court granted certiorari on St. Cyr's habeas appeal, to decide, inter alia, "whether depriving removable aliens of consideration for § 212(c) relief produces an imper-

missible retroactive effect for aliens who, like [St. Cyr], were convicted pursuant to a plea agreement at a time when their plea would not have rendered them ineligible for § 212(c) relief." *Id.* at 320.

Proceeding under the second prong of the *Landgraf* analysis, the Court held that applying the repeal of § 212(c) to aliens "who entered into plea agreements with the *expectation* that they would be eligible for [ ] relief clearly 'attaches a new disability, in respect to transactions or considerations already past.' " *Id.* at 321. (quoting *Landgraf*, 511 U.S. at 269) (emphasis added). Central to the Court's conclusion was the alien's "reasonable reliance" on the possibility of discretionary relief in deciding to waive his right to a trial and enter into the plea agreement:

> Plea agreements involve a *quid pro quo* between a criminal defendant and the government. In exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numerous tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources. There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions. Given the frequency with which § 212(c) relief was granted in the years leading up to AEDPA and IIRIRA, preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial.

*St. Cyr*, 533 U.S. at 321-23 (internal quotation marks, footnotes, and citations omitted). The Court concluded that because the respondent "almost certainly relied upon" the likelihood of receiving § 212(c) relief "in deciding whether to

forgo [his] right to a trial, the elimination of [that possibility] by IIRIRA ha[d] an obvious and severe retroactive effect." *Id.* at 325.

**B**

Judge Fisher in his separate concurrence acknowledges that Garcia-Ramirez lacks the *quid pro quo* that was central to the Court's analysis in *St. Cyr.* Judge Fisher concurrence at 11662. He does not view this omission as fatal to his analysis, however, contending that reasonable reliance is not the *sine qua non* for a holding of impermissible retroactive effect, and no doubt taking solace that *Landgraf* did not "define the outer limit of impermissible retroactivity." *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 947 (1997)).

I agree that the Supreme Court has not heretofore made any one factor of our retroactivity analysis dispositive. However, I would not stray from the Court's instructive example in the immigration context. *See Agostini*, 521 U.S. at 237. St. Cyr exchanged his "vested" legal right to trial relying on the assumption that it would not make him automatically deportable. This reliance was reasonable given the significant percentage of resident aliens granted § 212(c) relief at the time. *See St. Cyr*, 533 U.S. at 322-23. By entering into a plea agreement, St. Cyr in turn "grant[ed] the government numerous 'tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources.' " *Id.* at 322 (quoting *Newton v. Rumery*, 480 U.S. 386, 393 n.3 (1987)).

Garcia-Ramirez, on the other hand, petitioned our court hoping for the possibility to avail herself of a five-month trip she took after having been in the country illegally for less than a year, and introduced no evidence whatsoever that she made her trip with any expectation about immigration law consequence. Unlike St. Cyr, Garcia-Ramirez did not bargain away any existing legal right in reliance on the pre-IIRIRA

discretionary relief standard. In fact, in view of the absence of contrary evidence in the record, it seems very unlikely that, when she went to Mexico for five months, she was even conscious of the relief of suspension of deportation or its continuous physical presence requirement, to say nothing of its exception for "brief, casual, and innocent" trips. Even more unlikely is the possibility that she in any way tailored her trip to conform with that standard. The differences between St. Cyr's predicament and Garcia-Ramirez's status are telling and worth repeating: Unlike St. Cyr, Garcia-Ramirez had no "vested right" that she gave up or bargained away; she had no "reasonable reliance" on the law as it was before IIRIRA implemented Congress's reforms; and she had no "settled expectations" of the effect of her action in departing the United States. *See St. Cyr*, 533 U.S. at 321.[2]

Downplaying the importance of reasonable reliance and vested rights to the *St. Cyr* analysis, my colleague Judge Fisher notes that the Court in its *St. Cyr* opinion "presume[d]" St. Cyr's *quid pro quo*. Judge Fisher concurrence at 11662, 11666. He thus concludes that there is no need to address the fact that there is no evidence how Garcia-Ramirez could have reasonably relied on or even knew about pre-IIRIRA law. Instead, in his view, we can simply assume and impute rea-

---

[2]Moreover, the nature of the pre-IIRIRA "brief, casual, and innocent" standard belies the conclusion that Garcia-Ramirez or aliens in a similar circumstance could have reasonably relied on it, in connection with a five-month sojourn outside of the United States. The "brief, casual, and innocent" standard is vague and ambiguous, and Garcia-Ramirez's five-month excursion might not qualify as "brief, casual, and innocent" enough. If the pre-IIRIRA standard had permitted eligibility for suspension of deportation with departures of a longer duration than the 90/180 rule, and if a person could have relied objectively on a precise guideline for permissible absence, perhaps a better case could be made that aliens could objectively and reasonably rely on it in exiting and then reentering the country in accord with that time frame. In light of the ambiguity of the prior standard, and the apparent contrast of five months with its "brief" element, as it was written, any purported reliance—for a trip of five months—cannot properly be described as objectively "reasonable."

sonable reliance to Garcia-Ramirez from nothing more than the "statutory structure in 1989." *See* Judge Fisher concurrence at 11666. I disagree.

In the case of *St. Cyr*, the reasonable reliance factor could be presumed by the Court because the evidence there made reliance both apparent and objectively reasonable. *See St. Cyr*, 533 U.S. at 322 ("There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions."); *id.* ("Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence."); *id.* at 322 n.48 (citing state laws requiring trial judges to advise defendants of the immigration consequences of their plea agreements); *id.* at 323 n.50 (citing the Amicus Brief of the National Association of Criminal Defense Lawyers for the conclusion that "competent defense counsel, following the advice of numerous practice guides, would have advised St. Cyr concerning the provision's importance"); *id.* at 325 ("Prior to AEDPA and IIRIRA, aliens like St. Cyr had a significant likelihood of receiving § 212(c) relief.").

In sharp contrast, the record in this case is void of any evidence that Garcia-Ramirez even knew of the "brief, casual, and innocent" standard, to say nothing of why it is a reasonable assumption that she could have timed her trip purposely to avail herself of it. But there is no question that reasonable reliance, as illustrated in St. Cyr's plea bargain, was central to the Court's retroactivity analysis. *E.g.*, at 323 ("Given the frequency with which § 212(c) relief was granted in the years leading up to AEDPA and IIRIRA, preserving the possibility of relief would have been one of the principal benefits St. Cyr sought.") (footnote omitted). Faced with this predicament and with no evidence of reasonable reliance in sight, my able colleague makes two arguments. First, he points out that subjective actual reliance is not needed, and that Garcia-Ramirez's case shows an objectively reasonable reliance. But the idea

that reliance need not be an actual subjective reliance is nothing new, and does not address what evidence is necessary to show reasonableness. The Court in St. Cyr considered a *quid pro quo* to be an example of reasonable, not actual or subjective, reliance, presuming St. Cyr's reliance because of the general course of immigrant reliance on the possibility of INA § 212(c) discretionary relief when guilty pleas were entered. By contrast, here, there is no suggestion that illegal immigrants generally display any reliance on the "brief, casual, and innocent" standard in leaving the country for many months before reentry in illegal status.[3]

Second, Judge Fisher in his separate concurrence concludes that reasonable reliance can be assumed for Garcia-Ramirez (and thus in every similar case) from the general "old legal landscape" or "statutory structure in 1989." Judge Fisher concurrence 11667 & n.3. But this assumption effectively casts out reasonable reliance from our retroactivity assessment, disregarding the Court's sensible instruction otherwise: "As we have repeatedly counseled, the judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, *reasonable reliance*, and settled expectations." *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted) (emphasis added). My colleague's test would misapply the second step of the Court's seminal *Landgraf* analysis, making this second step a formality of analysis that inescapably will lead to a jurisprudential dead-end whenever Congress alters the "statutory structure." Under that form of analysis, were it adopted, the presumption against retroactive legislation likely would be applied whenever Congress has not explicitly declared retroactivity, satisfying the

---

[3]My colleague also relies on the Court's phrase in *St. Cyr* that "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." Judge Fisher concurrence at 11661, 11664 (quoting *St. Cyr*, 533 U.S. at 325). In my view, this phrase cannot be divorced from its context in *St. Cyr*, where it was tied to St. Cyr's reasonable reliance on the availability of discretionary relief from deportation when he pled guilty.

first prong of the *Landgraf* test. The line of analysis proposed by my colleague would go far to reduce *Landgraf* to a one-step analysis.

## C

Recognizing that *St. Cyr* cannot support his position that this case is a "paradigm instance" of impermissible retroactivity, my colleague looks for help from our prior precedent. Judge Fisher concurrence at 5, 7-8 (citing *Kankamalage v. INS*, 335 F.3d 858, 863 (9th Cir. 2003), and *United States v. Velasco-Medina*, 305 F.3d 839, 849-50 (9th Cir. 2002)). But these cases do not assist in de-emphasizing the importance the Supreme Court in *St. Cyr* placed on reasonable reliance, settled expectations, and vested interests, as illustrated through the *quid quo pro* of a plea bargain. In fact, both *Kankamalage* and *Velasco-Medina* hinge on the question of whether reliance on a pre-IIRIRA guilty plea was reasonable and created settled expectations.

Jayantha Kankamalage was an alien who, like St. Cyr, pled guilty to a conviction that would not have automatically disqualified him for relief from deportation under pre-IIRIRA law. *Kankamalage*, 335 F.3d at 860. We reiterated the importance of reasonable reliance: "[t]here can be little doubt that . . . alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *Id.* at 863 (quoting *St. Cyr*, 533 U.S. at 322) (alteration in the original). Because the current regulations would automatically disqualify Kankamalage from relief, we viewed the case as "like *St. Cyr*," concluding that the petitioner, again, based on the *quid pro quo* of his guilty plea, had legitimate settled expectations, and had reasonably relied on pre-IIRIRA law. *Id.* We therefore held that the regulation as applied to the petitioner was impermissibly retroactive. *Id.* at 864.

Pedro Velasco-Medina also pled guilty under pre-IIRIRA law and the statutory amendments retroactively made him

ineligible for cancellation of removal. *Velasco-Medina*, 305 F.3d at 843-44. However, in that case, we distinguished *St. Cyr* and concluded that, because the passage of AEDPA had already foreclosed any possibility of § 212(c) relief at the time Velasco-Medina entered his guilty plea, the petitioner, unlike St. Cyr, never possessed

> vested rights acquired under existing laws. . . . Thus, Velasco-Medina could not have developed the sort of settled expectations concerning § 212(c) relief that informed St. Cyr's plea bargain and that animated the *St. Cyr* decision.
>
> . . . .
>
> . . . To the extent he anticipated the continued availability of 212(c) relief after his guilty plea, his expectations were neither reasonable nor settled under *St. Cyr.*

*Id.* at 849, 850 (internal quotation marks and citations omitted). Far from minimizing the importance of *St. Cyr*'s *quid pro quo*, both *Kankamalage* and *Velasco-Medina* turn on whether an alien's reliance and expectations stemming from a guilty plea were settled and reasonable. These cases mention the "legal landscape" in discussing the effect of plea bargains, but *Kankamalage* and *Velasco-Medina* cannot correctly be urged to support making a change of the "legal landscape"— or the "statutory structure" as Judge Fisher also puts it—a test unto itself.[4]

---

[4]A step two *Landgraf* analysis in Garcia-Ramirez's case would be akin to our analysis in *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594 (9th Cir. 2002). *Jimenez-Angeles* dealt with almost the exact same situation we face here: the retroactive application of the continuous presence requirement for cancellation of removal, 8 U.S.C. § 1229b(d). Like Garcia-Ramirez, Alma Delia Jimenez-Angeles had no vested rights under pre-IIRIRA law, expressed through a plea bargain or otherwise, but merely hoped to be

Nor can my colleague properly find support for his analysis in extra-circuit case law. He cites two cases, from the Third and Fourth Circuits respectively, which did not emphasize the importance of reasonable reliance. Judge Fisher concurrence at 11663-64 (citing cases). While no court has addressed the exact question before us, my canvass of our sister circuits' precedents addressing the retrospective application of other IIRIRA provisions reveals that the great weight of authority places a due emphasis on reliance. Far from minimizing reliance, courts analyzing the retroactivity of IIRIRA provisions under *Landgraf*'s second prong routinely and properly stress the significance of reliance under *St. Cyr*. *See, e.g., Rankine v. Reno*, 319 F.3d 93, 102 (2d Cir. 2003) ("[T]he issue of reliance has played a central role in the Supreme Court's and the circuit courts' reasoning with respect to the retroactivity of IIRIRA and AEDPA."); *Chambers v. Reno*, 307 F.3d 284, 289-90 (4th Cir. 2002) (recognizing that reliance was the "key event" in *St. Cyr*'s retroactivity analysis).[5]

---

processed under pre-IIRIRA suspension of deportation instead of cancellation of removal because she had fulfilled the temporal presence requirement for the former but not the latter. *Jimenez-Angeles*, 291 F.3d at 597. Analyzing the retroactivity claim under step two of *Landgraf*, we held that her "expectation" or "hope" that she could avail herself of suspension of deportation "was not equivalent to the settled expectation St. Cyr gained by entering into his plea bargain." *Id.* at 602 ("A plea bargain is a formal exchange in which each side consensually gives, and gets, something of value. In Jimenez-Angeles' case, there was no such exchange."). In contrast to a formal plea bargain or any other evidence of reasonable reliance and settled expectations, Garcia-Ramirez, like Jimenez-Angeles, "gave up only her ability to continue living illegally and undetected in the United States." *Id.*

[5]Most circuits have declined to find reasonable reliance and impermissible retroactive effect beyond the plea agreement context of *St. Cyr*. The provision most frequently litigated has been IIRIRA's repeal of INA § 212(c), the same provision at issue in *St. Cyr*. Most courts have held IIRIRA not impermissibly retroactive as applied to petitioners who did not enter a plea agreement like St. Cyr because, without the *quid pro quo* of the plea agreement, no evidence exists from which to show a petitioner's

Judge Fisher's separate concurrence does not disclose a case, in our circuit or any other, in which a federal court has determined that there was reasonable reliance in the manner in which he would determine reliance, devoid of evidence or persuasive rationale why reliance, whether subjectively or objectively grounded, should be reasonably presumed for a class of persons situated similarly to the petitioner, save his general argument about change in the "statutory structure."[6]

---

reasonable reliance on the pre-IIRIRA provision. *See, e.g.*, *Swaby v. Ashcroft*, 357 F.3d 156, 161-62 (2d Cir. 2004) (holding that IIRIRA's repeal of INA § 212(c) was not impermissibly retroactive because, unlike St. Cyr, the petitioner chose to proceed to trial instead of agreeing to a plea and therefore "did not detrimentally rely on the availability of § 212(c) relief"); *Montenegro v. Ashcroft*, 355 F.3d 1035, 1037 (7th Cir. 2004) (per curiam) (holding that IIRIRA's repeal of INA § 212(c) relief not impermissibly retroactive as applied to petitioners who "did not abandon rights or admit guilt in reliance on continued eligibility for § 212(c) relief"); *Rankine*, 319 F.3d at 100 (same); *Dias v. INS*, 311 F.3d 456, 458 (1st Cir. 2002) (holding that IIRIRA's repeal of § 212(c) was not impermissibly retroactive to petitioners who did not rely on pre-IIRIRA law because the "retroactivity analysis must include an examination of reliance") (citing *Mattis v. Reno*, 212 F.3d 31 (1st Cir. 2000)); *Brooks v. Ashcroft*, 283 F.3d 1268, 1274 (11th Cir. 2002) (holding that the repeal of § 212(c) was not impermissibly retroactive because, unlike St. Cyr, petitioner "did not so choose to rely upon the agreed upon terms of a plea" and because his case did not present "the same concerns of *quid pro quo*, benefit for an exchange, between a defendant and the government").

Courts have declined to extend *St. Cyr* to other provisions of IIRIRA as well. *See, e.g.*, *Uspango v. Ashcroft*, 289 F.3d 226, 230 (3d Cir. 2002) (holding that the application of cancellation of removal's ten-year presence requirement to the petitioner was not impermissibly retroactive because "[u]nlike the situation in *St. Cyr*, [the petitioner] can demonstrate no detrimental reliance on pre-[IIRIRA] law" and "[the petitioner] gave up no rights . . . nor did [the government] receive any benefits from [the petitioner's action]"); *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 108-09 (4th Cir. 2001) (holding that IIRIRA § 241(a), requiring removal of aliens previously ordered removed, did not operate in an impermissibly retroactive manner because, unlike St. Cyr, the petitioner could not show "a reasonable likelihood of success under pre-IIRIRA law nor a detrimental reliance on pre-IIRIRA law").

[6]As explained above, the only cases that my colleague cites relying on language equivalent to its "statutory structure" language is the "legal land-

Nor does my able colleague point to any other case holding § 1229b(d)(2) or a comparable temporal provision of IIRIRA impermissibly retroactive.

## II

In almost any instance of immigration law reform, it will be the case that a multitude of illegal aliens were residing within the United States and its "legal landscape" or "statutory structure" when Congress acted to change the immigration law. It perhaps should not need repeating that the Constitution gives the superordinate role to Congress, and not to the federal courts, in regulating the flow and content of immigration to the United States. The world changes rapidly, and illegal immigration may pose threats or disadvantage to the United States' security, economy, and well-being. Congress needs flexibility in fine-tuning our immigration laws. *St. Cyr* carves out an exceptional area where reasonable reliance constrains the ability of Congress to alter immigration law. But nothing in *St. Cyr* or its immigration law progeny in the federal courts makes welcome a far-reaching pronouncement that impermissible retroactivity will likely follow from change to the "statutory structure." Such a rationale would restrict the ability of Congress to implement law reform, in the absence of explicit declarations of retroactivity, and would

---

scape" language of *Velasco-Medina*, 305 F.3d at 849, and *Kankamalage*, 335 F.3d at 863. But neither of those cases in fact relies upon such a rationale, as both hinge upon the evidence of reasonable reliance (or lack thereof) arising from a plea agreement's *quid pro quo*, just as in *St. Cyr*. *Kankamalage*, 335 F.3d at 863-64; *Velasco-Medina*, 305 F.3d at 850. More recently, in *Kelava v. Gonzales*, we held that IIRIRA's repeal of INA § 212(c) is not impermissibly retroactive as applied to an alien who engaged in a terrorist activity that occurred prior to IIRIRA's enactment. 410 F.3d 625, 630 (9th Cir. 2005). As relevant here, in *Kelava* we reiterated the importance of a plea showing reasonable reliance in applying the retroactivity analysis of *St. Cyr*: "We have cabined *St. Cyr* to the plea context, because of the alien's reliance on existing law in that situation." *Id.* at 629.

have unforseen negative consequences for the immigration laws.[7]

*Mendiola-Sanchez* supports our denial of the petition without reaching *Landgraf*'s second step. However, were we to reach the second step, I would still deny the petition because the application of the 90/180-day rule would not have an "impermissible retroactive effect."

---

[7]For example, during the pendency of our deliberations on this matter Congress enacted the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231. The REAL ID Act alters several provisions of the Immigration and Nationality Act, amending the INA provisions governing our judicial review as well as amending certain standards governing asylum and other forms of relief from removal, including burdens of proof, testimonial corroboration, credibility determinations, and the definition of terrorist organizations and terrorist related activities. *See, e.g.*, 8 U.S.C. § 1252(a) *as amended by* § 106(a) of the REAL ID Act, 119 Stat. 305, 310; 8 U.S.C. § 1158(b) *as amended by* § 101(a)(3), (c), and (d)(2) of the REAL ID Act, 119 Stat. 302, 303; 8 U.S.C. § 1182(a)(3)(B) *as amended by* § 103 of the REAL ID Act, 119 Stat. 306-309.